# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 11-00136-01-CR-W-ODS |
| | ) | |
| Plaintiff, | ) | Count One: Conspiracy |
| | ) | 18 U.S.C. § 371 |
| v. | ) | NMT: 5 Years Imprisonment |
| | ) | NMT: $250,000 Fine |
| JOSEPH HARRELL, | ) | NMT: 3 Years Supervised Release |
| [DOB: 09/16/1961], | ) | Class D Felony |
| | ) | |
| Defendant. | ) | $100 Mandatory Special Assessment for Count One |
| | ) | |
| | ) | Forfeiture Allegation |
| | ) | 28 U.S.C. § 2461(c) and 21 U.S.C. § 853 |
| | ) | |
| | ) | Order of Restitution |

## I N F O R M A T I O N

THE UNITED STATES ATTORNEY CHARGES THAT:

1. At all times material herein:

    a. Joseph **HARRELL** was a resident of Waco, Texas;

    b. **HARRELL** set up numerous LLCs, including in the names Kingdom Wealth, King's Favor, and Blue Whale, and he opened bank accounts in the names of those entities;

    c. Petro America maintained its headquarters and some of its bank accounts in Kansas City, Western District of Missouri. Isreal Owen Hawkins was the CEO and President of Petro America. Johnny Heurung and Teresa Brown were spokespersons for and promoters of Petro America;

    d. In or around June of 2008, Petro America began an unregistered, non-exempt offering of its securities to investors. During the course of the conspiracy, Petro and its agents sold unregistered stock to over 12,000 investors in the Western District of Missouri, Kansas, and across the United States and Canada;

e. Petro held meetings for shareholders on Tuesdays in the Western District of Missouri, which **HARRELL** frequently attended and participated in. In addition, Petro held a weekly conference call on Thursdays, which was listened to by shareholders in the Western District of Missouri, Kansas, and across the United States, and **HARRELL** frequently listened to these calls;

f. During the weekly conference calls, Hawkins, Heurung, Brown, and others made numerous untrue statements about Petro America. On at least one of the conference calls, **HARRELL** received a "shout out" from Hawkins to recognize the work that he was doing for Petro America;

g. On November 12, 2008, the Missouri Securities Commissioner issued a cease and desist order (C&D order) against Petro America and Owen Hawkins barring them from selling unregistered Petro stock to investors in Missouri. The order listed numerous problems with the stock and with the company. **HARRELL** was aware of the order. On April 30, 2010, the state of Kansas issued an additional C&D order, which **HARRELL** also became aware of;

h. **HARRELL** has never been licensed to sell securities;

i. The "Minister's Alliance" was a group of about 15 ministers, most of whom resided in the Kansas City area, who supported and promoted Petro America. **HARRELL** associated with and was affiliated with this group. They frequently held meetings, including at Denny's, 3832 Blue Ridge Cutoff, Kansas City, Missouri; and

j. From June 2009 forward, Owen Hawkins, Teresa Brown, Johnny Heurung, and others falsely claimed to investors that Petro America would soon be a publicly listed company, that its shares would be worth $24 each, and that the company was worth $284 billion. The conspirators made many of these misrepresentations at meetings held in the Western District of Missouri, and through conference calls, which were listened to by investors in the Western District of Missouri and across the United States.

## COUNT ONE: CONSPIRACY

### A. INTRODUCTION

2. The United States Attorney hereby repeats and realleges every allegation contained in paragraph 1 of this Information.

## B. THE CONSPIRACY

3. From on or about November 12, 2008 until in or about October 2010, in the Western District of Missouri and elsewhere, defendant Joseph **HARRELL** and others, named and unnamed herein, did knowingly, willfully and with intent to defraud, conspire and agree amongst themselves to commit and to conceal offenses against the United States, that is: to commit the crimes of securities fraud in violation of 15 U.S.C. § 77q, and of wire fraud in violation of 18 U.S.C. § 1343. The object of the conspiracy was to obtain money through the fraudulent sale of Petro America stock by making fraudulent material misrepresentations and omissions to investors, including by overstating Petro's assets, obfuscating the source and price of shares, concealing negative material information, and concealing the true nature of their roles and compensation.

## C. MANNER AND MEANS

4. It was part of the conspiracy and in furtherance of it, that in order to induce persons to invest money in Petro America, the defendants made and caused to be made false and fraudulent statements, and material omissions, as set forth below, which are incorporated herein by this reference as though fully set forth at this point.

5. It was further part of the conspiracy that in order to enable Petro to continue selling its stock in an attempted circumvention of the Missouri cease and desist order, and to enable the conspirators to profit, Hawkins gave **HARRELL** and others billions of shares of Petro stock. **HARRELL** agreed to sell the stock to investors, and he provided money from the proceeds back to Hawkins.

6. It was further part of the conspiracy that **HARRELL** sold millions of shares, including to investors in the Western District of Missouri. **HARRELL** did not disclose the specific amount

of compensation he and others would receive, and he did not disclose material negative facts about Petro America. **HARRELL** represented that he was an investor selling his own shares. He did not disclose to buyers that most of the shares had been gifted to him.

7. It was further part of the conspiracy that the conspirators, including **HARRELL**, made material misrepresentations to buyers of Petro stock, including: a) the stock had earlier been purchased by the seller and was being resold; b) it was worth $24 per share; c) Petro was valued at $284 billion; d) the gold mine assets were real, and the seller had seen them; and e) Petro would soon be listed on a public exchange. Further, the conspirators failed to disclose negative material facts to investors, which prevented them from making an informed purchasing decision, including: aa) all shares were unregistered; bb) Petro was not legally authorized to offer any shares; cc) two cease and desist orders had been issued in Missouri and Kansas, due to numerous listed improprieties; dd) the sales price was arbitrary, and set by the seller depending on what they thought the buyer would pay; ee) "gifting" billions of shares diluted any value the shares could have; ff) the sellers were not licensed to sell stock; gg) kickbacks from the sales were paid to Hawkins, Brown, and others; hh) Hawkins, Brown, the Minister's Alliance, and others were spending investor money on extravagant personal expenses; ii) none of the investor money was going back into Petro for assets or to help it "go public"; and jj) stock certificates were back-dated to appear they were issued prior to the cease and desist orders.

8. It was further part of the conspiracy that **HARRELL** did not ascertain with state authorities, or with the Securities and Exchange Commission, whether the C&D orders were in effect, whether it was legal for him to sell Petro shares, or whether the shares were registered. He did not ensure that investors had full disclosure regarding the risks of investing in Petro America.

**HARRELL** also made numerous bullish statements to investors concerning Petro's future potential to become a publicly-traded company, and of its claimed assets, which were untrue.

9. It was further part of the conspiracy, that in furtherance of his efforts to sell Petro America stock, **HARRELL** frequently made interstate phone calls to investors and to potential investors in other states, including from Texas to the Western District of Missouri, and from Texas to other states and provinces across the United States and Canada, including Florida.

10. It was further part of the conspiracy that from February 2010, to October 30, 2010, **HARRELL** received at least $369,605 from the sale of Petro stock.

## D. OVERT ACTS

11. Between March 2010 and November 2010, **HARRELL** caused to be deposited $385,460 in proceeds into bank accounts that he controlled from the sale of Petro America stock to at least 59 investors across the United States. In connection with those sales, **HARRELL** intentionally made numerous misrepresentations and omissions concerning material facts necessary for the investors to make an informed purchasing decision regarding whether to invest in Petro America.

    a. **HARRELL** did not disclose to investors the risks of investing in Petro America stock, including that the company had been issued two cease and desist orders.

    b. **HARRELL** did not disclose to investors that the stock was not registered.

    c. **HARRELL** did not disclose to investors that most of the shares had been given to him and that he had not invested any substantial amount to purchase the shares.

    d. **HARRELL** did not disclose to investors that he was selling stock to some investors for as little as $.01 per share to some investors and as much as $.10 per share to others.

    e. **HARRELL** did not disclose to investors that some of their investment proceeds would be paid to Hawkins.

  f. **HARRELL** did not disclose to investors that, after July 2010, **HARRELL** was aware that Hawkins was spending Petro investor proceeds on inappropriate personal expenditures.

12. Between March 2010 and November 2010, **HARRELL** attended and participated in numerous meetings related to Petro America in the Western District of Missouri, including meetings held at the following locations:

  a. Holiday Inn, 12801 South 71 Highway, Grandview;

  b. Denny's, 3832 Blue Ridge Cutoff, Kansas City; and

  c. Brio Tuscan Grille, 502 Nichols Road, Kansas City.

13. On or about September 9, 2009, **HARRELL** formed an LLC named Kingdom Wealth. He opened an account in the name of this entity at Wells Fargo Bank on March 10, 2010 for the purpose of depositing proceeds from his sales of Petro America stock. He opened an account in the name of Kingdom Wealth (Petro) at Wells Fargo Bank on June 29, 2010 for the purpose of depositing proceeds from his sales of Petro America stock, and to write checks on behalf of Petro America while serving as its Chief Financial Officer.

14. On or about June 3, 2010, **HARRELL** received, through the mail, a check made out to Joseph Harrell from an investor for $1,000 for 10,000 shares of Petro.

15. On or about June 20, 2010, **HARRELL** formed an LLC named Blue Whale. He opened an account in the name of this entity at Wells Fargo Bank on June 21, 2010, into which he transferred proceeds from his sales of Petro America stock.

16. In July 2010, **HARRELL** told a Florida investor via an interstate phone call that the investor needed to purchase $3,000 worth of shares soon, or the opportunity would be closed. The

6

investor bought shares for $2,450, wiring the money to **HARRELL**'s Kingdom Wealth LLC account on July 14, 2010, September 25, 2010, and October 2, 2010.

## FORFEITURE ALLEGATION

17. By this reference the allegations contained in paragraphs 1 through 16 are re-alleged and incorporated for the purpose of alleging forfeiture to the United States pursuant to 28 U.S.C. § 2461(c), 18, U.S.C. § 981(a)(1)(C), 18 U.S.C. § 1956(a)(1)(C), 18 U.S.C. § 1956(c)(7)(A), 18 U.S.C. § 1961(1), and 21 U.S.C. § 853.

18. As a result of the offense alleged in Count One, Joseph **HARRELL,** defendant herein, shall forfeit to the United States all property, real and personal, constituting, or derived from proceeds traceable to these offenses, including a money judgment in the amount of $385,460, representing the proceeds of and property involved in the charged offenses.

19. If any of the property being subject to forfeiture, as a result of any act or omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred, or sold to, or deposited with, a third person;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided

without difficulty; it is the intent of the United States pursuant to 21 U.S.C. § 853(p) to seek

forfeiture of any other property of **HARRELL** up to the value of the forfeitable property (approximately $385,460).

                                               Beth Phillips
                                               United States Attorney

                                       By    /s/ Daniel M. Nelson

                                               Daniel M. Nelson #53885
                                               Assistant United States Attorney

Dated:    June 14, 2011
         Kansas City, Missouri